NIEMEYER, Circuit Judge,
dissenting:
Under the National Flood Insurance Program, Congress provides flood insurance with defined limits for commercial properties and with different limits for residential properties, all as specified by statute. When, as the majority concludes, the statute’s specification of those limits is ambiguous, we 'must construe the statute narrowly so as not to appropriate more money for insurance coverage than Congress intended. The majority violates this fundamental principle, applying private contract law principles to favor insureds and thus to expand coverage at the expense of the public fisc. This is a fundamental error of law.
Particularly, the majority finds ambiguity in the limits of coverage provided by 42 U.S.C. § 4013(b)(4), which provides flood insurance for commercial properties. It then resolves the ambiguity against Congress and in favor of providing increased amounts of insurance coverage without concluding that those amounts, are dearly authorized by the text of the statute. It does this (1) by applying the canon of private contract law that ambiguous insurance policies be construed against the drafter, and (2) by relying, on the generally stated purpose of the insurance program. This approach, however,-violates the bedrock norm of authorizing no more money from the public fisc than Congress clearly intended. It also undertakes statutory construction backwards- — by looking first at the statute’s benevolent purpose and then making the text fit that purpose.
Because the text of 42 U.S.C. § 4013(b)(4) and related ■ factors demonstrate that the statute provides an aggregate limit for commercial flood insurance coverage on a per-structure basis, I dissent from the majority’s conclusion that holds the stated limit to be available for each insured — a holding that substantially expands the government’s financial obligations. My position is supported by both the statute’s text and its context.
In authorizing commercial flood insurance, 42 U.S.C. § 4013(b)(4) provides limits as follows:
*254 [I]n the ease of any nonresidential property, [unsubsidized] flood insurance ... shall be made available to every insured upon renewal and every applicant for insurance, in respect to any single structure, up to a total amount ... of $500,000 for each structure and $500,000 for any contents related to each structure ....
(Emphasis added). The majority opinion assigns no relevant meaning to the phrase “in respect to any single- structure,” concluding that the limit applies to each separate insured, not each “single structure.” Yet, this is a key phrase in the paragraph at issue and a phrase whose meaning can be ascertained by a careful reading of the text.
The subject of the sentence is “insurance”; the verbal phrase is “shall be made available”; and three prepositional phrases then follow, set off by serial commas: (1) “to every insured ...(2) “in respect to any single structure,” (3) “up to a total amount....” As written, the prepositional phrase “in respect to any single structure” can only modify the verb, “shall be made available,” because it does not make sense modifying “insured.” Thus, the operative language reads: “Flood insurance shall be made available, in respect to any single structure, up to a total amount of $500,000 for each structure and $500,000 for any contents.” On this reading, it is clear that coverage is provided on a per-structure basis.[1]
Moreover, as so read, the language is not “inconsistent,” as the majority finds in dismissing the language. The language is only inconsistent when one ignores the role that the three prepositional phrases play in the sentence — that they all modify the verb. The first phrase answers the question: “To whom and when may insurance be made available?” The second answers the question: “With regard to what may insurance be made available?” And the third phrase answers the question: “In what amount may insurance be made available?” Because the phrases are set off with serial commas, it is clear that each phrase modifies the verb of the sentence, not a noun within another prepositional phrase. And because all three phrases modify the verb, they progressively and cumulatively narrow the verb. “Up to a total amount” modifies the verb, as previously modified by the “in respect to any single structure” language. Quantifying the coverage that “shall be made available” “in respect to any single structure,” the paragraph gives the limit of $500,000 for the building and $500,000 for its contents. The “up to a total amount” phrase cannot somehow modify “insured,” as the majority impliedly believes. “Insureds” cannot be quantified by dollars. The majority’s implied reading ignores the commas that set the phrases off from each other and thereby preclude one phrase from modifying another. The “up to a total amount” phrase modifies “shall be made available,” subject to all the modifications that have already been made. Since the modifications include the “in respect to any single structure” language, it is clear that the cap acts as a limit on per-structure coverage and not on per-insured coverage.
In addition to this textual analysis, six factors point to the interpretation that the statute provides a per-structure limit, not a per-insured limit, for commercial flood insurance.
First is the relationship of § 4013(b)(4) (providing commercial coverage) with *255 § 4013(b)(2) (providing residential coverage). Paragraph (b)(2) provides the limits of insurance coverage for residential structures, stating:
[I]n the case of any residential property, [unsubsidized] flood insurance shall ... be made available to every insured upon renewal and every applicant for insurance so as to enable such insured or applicant to receive coverage up to a total amount ... of $250,000.
(Emphasis added). Thus, in the case of residential property, it is crystal clear that each insured can get up to $250,000 in coverage, with no aggregate cap for the building. The majority’s reading of the statute fails to account for paragraph (b)(2) in two ways. First, it fails to explain why (b)(4) and (b)(2) would express the exact same concept — that each insured can get a certain amount of coverage without regard to the total insurance on the entire building — in completely different ways. Congress knew how to reach the result that the majority is after, and. did so unambiguously in paragraph (b)(2). That Congress did not do so in (b)(4) should be dispositive. Second, the majority’s reading fails to give any meaning to the phrase in (b)(4) “in respect to any single structure.” That phrase is present in (b)(4), but not in (b)(2). Yet on the majority’s reading, it is given no meaning at all, as the same result can be reached with or without the phrase. Whatever role the majority could assign to the phrase “in respect of any single structure” in (b)(4) cannot be squared with its exclusion in (b)(2) — it is simply surplusage in (b)(4). I would hold that the phrase does have a meaning, and that meaning can only be to limit the coverage available for commercial structures to $500,000 for each structure.
Second is the relationship of § '4013(b)(4) coverage with § 4013(b)(1) coverage. Paragraph (b)(1) provides subsidized flood insurance, providing a first tier of insurance. Paragraph (b)(4) provides a second tier of unsubsidized flood insurance once the limits available in (b)(1) are exhausted. The amount of available subsidized coverage is specified:
[I]n the case of business properties which are owned or leased and operated by small business concerns, an aggregate liability with respect to any single structure, including any contents thereof related to premises of small business occupants ... which shall be equal to (i) $100,000 plus (ii) $ 100,000 multiplied by the number of such occupants and shall be allocated among such occupants (or among the occupant or occupants and the owner) under regulations prescribed by the Director; except that the aggregate liability for the structure itself may in no case exceed $100,000....
42 U.S.C. § 4013(b)(1)(B). This paragraph unambiguously caps the aggregate coverage for “any single structure ” at $100,000. It would be anomalous to say that subsidized building coverage under, paragraph (b)(1) is capped at $100,000, but that unsubsidized building coverage under paragraph (b)(4) is uncapped, as the majority concludes.[2] There would be no explanation as to who might receive the subsidized building coverage, or what to do if the landlord or one tenant, acting quickly, has purchased all the subsidized building coverage, leaving none for any other tenant in the building.
*256 Third is the relationship between the current version of § 4013(b)(4), as amended in 1994, and the prior version (1993). Paragraph (b)(4) as it existed in the prior 1993 version read:
[I]n the case of business property owned, leased, or operated by small business concerns ... [unsubsidized] flood insurance ... shall be made available to every such owner, lessee, or operator in respect to any single structure, including any contents thereof, related to premises of small business occupants (as that term is defined by the Director), up to an amount equal to (i) $250,000 plus (ii) $200,000 multiplied by the number of such occupants which coverage shall be allocated among such occupants (or among the occupants or occupants and the owner) in accordance with the regulations prescribed by the Director pursuant to such subparagraph (B), except that the aggregate liability for the structure itself may in no case exceed $250,000 ....
42 U.S.C. § 4013(b)(4) (1993 version) (emphasis added). The change in language between the 1993 version of the statute and the current version provides the best basis for the majority’s reading of the statute. The majority correctly notes that we generally assume that changes in statutory language are meaningful. In this case, however, the majority provides no textual basis for its understanding of the current version of the statute, so it cannot say how the amendment changed the intended meaning, only that it must somehow be different. But based on my reading of the current statute, the language that was included in the prior 1993 version — “except that the aggregate liability for the structure itself may in no case exceed $250,000” — was omitted from the current statute because it was redundant. This is reinforced by the inclusion in the current statute of the serial commas setting off the prepositional phrase “in respect to any single structure.” The commas restructured the sentence, applying limits on a per-structure basis, and thus removed the need for the now-redundant “aggregate liability” language that had been included in the 1993 version.
Fourth, the regulations promulgated by FEMA under § 4013(b)(2) provide an administrative interpretation of the available limits of insurance which contradicts the majority’s analysis. See 44 C.F.R. § 61.6. In § 61.6(a), the regulation lists the limits available for flood insurance of various kinds, including the commercial insurance under § 4013(b)(4). For nonresidential small business properties, the regulation lists the total building coverage available as $500,000. For contents coverage, the regulation specifies that limits are on a “per unit” basis. Id. § 61.6(a) n. 2. By explicitly making coverage for contents on a “per-unit” basis, but not coverage for the building, FEMA understood that building coverage would not be on a per-unit basis. In fact, when FEMA wanted to insure residential buildings on a per-unit basis under § 4013(b)(2), it made the coverage clear. Thus, § 61.6(b) provides that “[i]n the insuring of a residential condominium building in a regular program community, the maximum limit of building coverage is $250,000 times the number of units in the building.” Id. § 61.6(b). If residential coverage under 42 U.S.C. § 4013(b)(2) were to be parallel with nonresidential coverage under § 4013(b)(4), as the majority asserts, it is inexplicable that FEMA would specify that insurance of paragraph (b)(2) losses is on a per-unit basis, but not insurance of paragraph (b)(4) losses, such as the losses here. We must not be so quick to ignore the agency’s considered opinion, especially when, as the majority concedes, the statute is ambiguous.
*257 Fifth, the majority’s reliance on a particular brand of legislative history vividly demonstrates the sinister snare inherent in such reliance. The majority cites a statement of Representative Joseph Kennedy that the 1994 bill was intended to “increase the number of people covered by flood insurance.” 140 Cong. Rec. H2961 (daily ed., May 3, 1994) (statement of Rep. Kennedy). Indeed, this seems to be the key factor behind the majority’s choice to resolve the ambiguity in favor of more coverage. In the context of the rest of Representative Kennedy’s remarks, however, this statement cannot possibly be used, even as a tie-breaker, to decide the issue here. Representative Kennedy went on, after the quoted language, to give the means by which participation was to be increased — i.e., by requiring mortgage lenders to enforce flood insurance purchase requirements. Id. At no point in Representative Kennedy’s remarks did he allude to the provision at issue here in any way, let alone as a mechanism by which to increase participation in the program. Not only did Representative Kennedy fail to mention the provision at issue here, but neither did anyone else during the course of the entire legislative debate. Indeed, no one even mentioned business flood insurance as a discrete matter. When it is added that the legislation “was rushed to the floor after an agreement was reached only last week,” id. H2967 (statement of Rep. Shaw), it is unlikely that “more than a handful of Members [had] reviewed or even seen the legislation that [was before them] for a vote.” Id. The idea that Representative Kennedy’s statement reflects the intent of Congress can only be laughable. Finally, making the majority’s reliance truly incomprehensible, the remark was made to a chamber in which the chair “counted two Members standing [and] less than 10 Members on the floor.” Id. at H2967.
The majority also reads the 1994 amendment as part of an “ongoing effort to increase the number of people covered by flood insurance,” pointing to increases in coverage limits that were enacted in 1973 and 1977. A series of routine increases in the amount of coverage, however, hardly reveals an intent to increase the number of people covered. To the contrary, one should use this history to construe the 1994 amendment as simply a continuation of earlier increases. Yet the majority reads the third increase in 1994 as a “sign” of Congress’ intent to expand now the number of persons covered, even though Congress did nothing to indicate such intent.
The majority is forced to rely on such meager and misleading scraps of legislative history because the more reliable forms of legislative history provide it no help. The committee report relating to the provision stated only that it “[i]ncreas-es coverage for nonresidential structures to $500,000. Increases content coverage for nonresidential structures to $500,000.” H.R.Rep. No. 103-414, § 602 (1994). The fact that the House Report did not even devote a complete sentence to the provision at issue here shows the danger of relying on legislative history to decide this case. Most importantly, the most authoritative source of legislative history, the House Report, shows no intention that the provision of flood insurance be changed from, a per-structure basis to a per-insured basis, only an intention to increase the limits. Thus, to the extent that the legislative history is notable at all, it is notable for its complete silence as to what was, under the majority’s reading, a major change in the federal flood insurance program.
Sixth, the majority cites a canon of interpretation that ambiguous provisions of insurance policies should be construed in *258 favor of the insured. Of course, this canon of contract construction does not apply by its own terms to the interpretation of a statute. But more importantly, applying the canon here resolves the ambiguity against the Treasury of the United States without a congressional appropriation. This is in direct violation of both statutory command and constitutional principle. See 31 U.S.C. § 1301 (“A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made”); U.S. Const., Art. 1, § 8 (“No money shall be drawn from the treasury, but in consequence of appropriations made by law”). The purportedly ambiguous statute must be construed narrowly so as to not to encroach on Congress’s power of the purse.
The majority’s unfortunate expansion of the National Flood Insurance Program opens the door to disastrous fiscal consequences.[3] Under the majority’s reading, the aggregate amount of coverage available to businesses becomes effectively uncapped. Each insured can obtain up to $1 million in total flood insurance. Thus, where a shopping mall with 100 tenants is flooded and destroyed by an ocean surge, the government will have a potential liability of $100 million for just that mall. Multiplied across the country, the majority’s decision might extend the government’s obligations by many billions of dollars. We should hesitate to adopt an expansive reading with these consequences, particularly when the expansion is justified solely by the program’s generally articulated purpose.
I would reverse the judgment of the district court.

. The prepositional phrase, "to every insured upon renewal and every applicant” is included to indicate that one acquires new coverage at the renewal date or on the commencement of a new policy period, not in the middle of one.

. The inclusion in subparagraph (b)(1)(B) of the explicit cap on "aggregate liability for the structure” is necessary to make clear that even though total subsidized coverage for both contents and structure is capped only by the number of tenants, the coverage for the structure itself is capped at $100,000. Such language is unnecessary in § 4013(b)(4) because (b)(4) caps coverage for both structure and contents at the same level ($500,000).

. The majority claims that its interpretation will result in the issuance of more flood insurance policies with higher limits and that this would somehow help "build the reserves to pay all claims every year.” The majority recognizes that each policy issued under the program is a money-losing policy that the government subsidizes every year, but apparently it believes in the motto, "We lose money on every sale, but we make up for it on volume.”